**UNITED STATES of America,**

v.

**Isidore B. RUTSTEIN, Defendant.**

United States District Court
S. D. New York.
June 6, 1958.

Paul W. Williams, U. S. Atty., S. D. New York, New York City, for the United States, William S. Ellis, Asst. U. S. Atty., New York City, of counsel.

Harry Mitchell, Brooklyn, N. Y., for defendant.

FREDERICK van PELT BRYAN, District Judge.

Defendants Rutstein and Schuster were charged in a three count indict-

ment with conspiracy to violate the Oleomargarine Act of 1950, 21 U.S.C.A. §§ 331(m), 333(b) and 347(b), and with two substantive violations of that statute. Defendant Schuster pleaded guilty to the conspiracy count and there was a severance as to him. The case was tried before me without a jury against the remaining defendant Rutstein.

The Oleomargarine Act of 1950, in so far as relevant here, forbids the sale or offer for sale of colored oleomargarine unless it is packaged and labeled in accordance with the requirements of the Act. The full text of the relevant Section 347(b) appears in the margin.[1]

The question presented here is whether the labeling requirements of the statute apply only to packages of one pound or less sold in retail establishments, or also to sales at wholesale to jobbers or wholesalers in large sixty-four pound cubes.

No reported cases have been cited to me which have construed these statutory provisions and research has failed to disclose any. The question appears to be one of first impression.

Count I of the indictment charges that the defendants Rutstein and Schuster, and Abramson and Alpert, named as co-conspirators but not defendants, conspired to violate 21 U.S.C.A. § 331(m). Counts II and III charge that on September 18, 1951 and September 25, 1951 respectively, the defendants Rutstein and Schuster, with intent to defraud and mislead, unlawfully sold and caused to be sold to H. Wool & Sons, Inc., a number of cartons containing colored oleomargarine on which the word "oleomargarine" or "margarine" or a statement of the ingredients contained therein did not appear on the label in violation of 21 U.S.C.A. §§ 331(m), 333(b), 347(b) (3), and 18 U.S.C. § 2.

Count II of the indictment was dismissed during the course of the trial on the Government's own motion. At the close of all the evidence decision was reserved on a motion by defendant for a judgment of acquittal on the remaining two counts.

The Government's version of the facts, as adduced at the trial, is as follows:

In November 1950 Abramson visited Alpert at his place of business, The Temptee Butter and Egg Company, 514 Westchester Avenue, Bronx. Alpert told Abramson that he needed capital to finance his business operations and Abramson indicated that he knew of someone who could provide the necessary funds.

Abramson then went to see defendant Rutstein at his place of business, the Exchange Place Realty Company, 35 Montgomery Street, Jersey City, and talked to him about financing Alpert's business. Rutstein indicated that he was interested and inspected the premises at 514 Westchester Avenue, together with Schuster. Several more meetings between the defendant, Alpert, Schuster and Abramson were held at the Jersey City and Bronx premises, with the result that defendant Rutstein decided that Exchange Place Realty would invest $12,000 in Alpert's business.

At one of the meetings between defendant Rutstein and the alleged co-conspirators, he is said to have stated that it was impossible to make a profit by selling butter and eggs and that they should produce a mixture of oleomargarine and butter which would be sold as

---

1. 21 U.S.C.A. § 347(b) reads as follows:
   "Labeling and packaging requirements.
   "(b) No person shall sell, or offer for sale, colored oleomargarine or colored margarine unless—
   "(1) such oleomargarine or margarine is packaged.
   "(2) the net weight of the contents of any package sold in a retail establishment is one pound or less.
   "(3) there appears on the label of the

package (A) the word 'oleomargarine' or 'margarine' in type or lettering at least as large as any other type or lettering on such label, and (B) a full and accurate statement of all the ingredients contained in such oleomargarine or margarine, and
   "(4) each part of the contents of the package is contained in a wrapper which bears the word 'oleomargarine' or 'margarine' in type or lettering not smaller than 20-point type."

butter. The others agreed, and it was decided that a corporation would be formed for that purpose.

The group met at the offices of Alpert's attorneys, and a corporation, Temptee Food Co., Inc., was organized. Alpert was named president, and Schuster secretary-treasurer.

A bank account was opened at the Modern Industrial Bank, in the Bronx, and the plan was put into effect. The four met regularly at the Westchester Avenue premises for the purpose of blending butter with oleo. A Hobart mixer was used for the blending process, salt and artificial coloring were added, and the resulting substance was then placed in the freezer. Defendant Rutstein was present at most of these sessions, gave instructions as to how the mixing should be accomplished and was the one in charge of the operations.

The actual sale of the product was handled by Abramson. The mixture, in bulk sixty-four pound cubes, was sold to H. Wool & Sons, Inc., a wholesaler or jobber of dairy products.

Each sixty-four pound cube was wrapped in parchment and placed in a separate carton. The word "margarine" or "oleomargarine" did not appear on the cartons or the parchment wrappings and neither bore any description of their contents.

Defendant Rutstein denied that he participated in any illegal transactions. He testified that he was in the real estate business and that his only interest in the 514 Westchester Avenue premises was as a real estate investment. He denied knowledge that any mixing of butter and oleomargarine had taken place there and stated that he had nothing whatsoever to do with the production, packaging or sale of the product and had never read the label on the cartons.

It is unnecessary for me to resolve the issues of fact raised at the trial for my ruling on the defendant's motion for a judgment of acquittal will dispose of the case. In making such ruling I shall assume that the Government's evidence is true and shall consider only whether that evidence is sufficient in law to sustain the charge contained in the indictment.

Defendant's principal contention is that the Oleomargarine Act of 1950 applies only to sales by retailers to the consuming public and has no application whatsoever to sales made by a producer or manufacturer to a wholesaler or jobber such as are involved here. Defendant therefore asserts that none of the acts with which he is charged were in violation of the statute on which the indictment is based.

An analysis of 21 U.S.C.A. § 347(b) supports the defendant's position. The statute forbids the sale or offering for sale of colored oleomargarine unless (1) it is packaged; (2) "the net weight of the contents of any package *sold in a retail establishment* is one pound or less"; (3) "there appears on the label of *the package*" the word "oleomargarine" or "margarine" in type or lettering at least as large as any other type or lettering on the label, and a full and accurate statement of all the ingredients; and (4) "each part of the contents of *the package* is contained in a wrapper which bears the word 'oleomargarine' or 'margarine' in type or lettering not smaller than 20-point type."

The Government contends that the words "the package", as used in subdivisions 3 and 4 of Section 347(b), include all packages of margarine sold or offered for sale whether in retail establishments or in the wholesale trade and regardless of size. It says, therefore, that all the requirements as to labeling and stating the ingredients apply to wholesale sales in 64 pound cubes, such as occurred here, as well as to the small packages of one pound or less which are the largest that can be sold in a retail establishment.

It is plain to me, however, that the words "the package" in subdivisions 3 and 4 refer only to the package mentioned in the previous subdivision 2—that is to say "any package" of one pound or less which can be sold in a retail establishment to the consuming public.

Subdivision 2 is the first place in Section 347(b) where the word "package" is used and the reference there is to a specific kind of package only.

■■■■ Even without the necessarily strict construction which must be given to this criminal statute (United States v. Wiltberger, 5 Wheat. 76, 5 L.Ed. 37; Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356) a fair reading of the statute could lead to no other result than that *"the package"* used in subdivisions 3 and 4 refers only to any package of one pound or less sold in a retail establishment just referred to in subdivision 2.

This conclusion is bolstered by the language of subdivision 4 of § 347(b). The requirement that each *part* of the contents of *the package* must be "contained in a wrapper which bears the word 'oleomargarine' or 'margarine' in type or lettering not smaller than 20-point type" is quite inappropriate on a 64 pound wholesale carton of the type alleged to have been used in the transactions at bar. Such 20-point type, *while it would direct* the attention of the consuming public to the fact that a one pound or quarter pound package contained oleomargarine, would be. so small as to be easily overlooked on a 64 pound wholesale carton, and it is highly unlikely that such a small sized type would have been prescribed for this purpose.

Any doubt that this is the correct interpretation of the statute is resolved by reference to its legislative history. A review of such history makes it apparent that the Act was intended only to cover oleomargarine packaged for retail sale and was not intended to cover wholesale transactions such as those here.

The Reports of the Congressional Committees concerned with the Oleomargarine Act of 1950, and the debates on the Act, indicate that a main object of the statute was the repeal of burdensome taxes which had been imposed originally by the Act of August 2, 1886, 24 Stat. 209,[2] on the manufacture, distribution and sale of oleomargarine.[3] During the lengthy Congressional debates it became increasingly clear that both the proponents and the opponents of the measure were in agreement that the oleomargarine taxes should be repealed.[4] The battleground upon which the extended oleomargarine fight in Congress was waged was not upon the tax repeal question at all but rather as to the best methods of protecting consumers from the danger that oleomargarine, because of its similarity to butter, might be misrepresented as butter to unwary consumers.[5]

The regulatory provisions of the Oleomargarine Act of 1950 were revised several times during the pendency of the bill before the Congress.

The bill as originally passed by the House (H.R. 2023) did not contain any reference to "the sale or offering for sale" of colored oleomargarine. Instead the bill was concerned with the "serving" of colored oleomargarine in public eating places and prescribed certain rigid requirements as to notice and labeling which restaurant owners were required to observe before they could serve oleomargarine to their patrons.[6] Among the requirements of the original bill were that a notice that oleomargarine was served had to be posted at a prominent place in the restaurant or printed on the menu, and each separate serving

2. See, also, Act of May 9, 1902, 32 Stat. 193; Act of March 4, 1931, 46 Stat. 1549.

3. H.R.Rep. No. 277, 1950 U.S.Code Congr. Svs. 1968; S.Rep. No. 309, 1950 U.S. Code Congr.Svs. 1970; 96 Cong.Rec. 47, 81st Cong., 2nd Sess., 1950.

4. See § 6 of The Gillette-Wiley Amendment to H.R. 2023 at 96 Congr.Rec. 46, the

remarks of Sen. Gillette at 96 Congr.Rec. 73, 74, and of Sen. Humphrey at 96 Cong. Rec. 257, 81st Cong., 2nd Sess. 1950.

5. See debates commencing at 96 Congr. Rec. 44, 73, 116, 257, 277, 294, 301, 331, 343, 378, 382, 396, 439, 463, 508, 544, 559, 1381, 2971, 3016, 81st Cong., 2nd Sess. 1950.

6. 96 Congr.Rec. 45, 81st Cong., 2nd Sess. 1950.

had to contain an identifying label, or, in the alternative, was to be served in triangular shape.[7] The Senate Finance Committee reported the House bill favorably and recommended only relatively minor amendments.[8]

While H.R. 2023 was under consideration by the Senate an amendment was offered by some twenty-five Senators (The Gillette-Wiley amendment) which would have prohibited "the manufacture, transportation, handling, possession, sale, use, or serving of yellow oleomargarine in commerce, or after shipment in commerce * * *." [9] The practical effect of this amendment, of course, would have been to prevent the oleomargarine producers from coloring their product yellow.

According to its sponsors the object of the Gillette-Wiley amendment was to prevent the fraudulent selling or serving of oleomargarine as butter.[10] The merits of this amendment were debated at great length and many arguments were advanced both for permitting and prohibiting the use of the color yellow in the manufacture of oleomargarine before the amendment was finally defeated. As is readily apparent from a reading of the Congressional debates, by far the greater part of the proceedings in the Senate were addressed to the merits of the Gillette-Wiley amendment.

After the defeat of the Gillette-Wiley amendment [11] another amendment to H.R. 2023 was offered by Senator Frear.[12] The Frear amendment, which used the phrase "sale or offering for sale" for the first time, is important in that it suggested some of the relevant language which was to find its way into the final Act.[13] The proponents of H.R. 2023 in the Senate accepted the Frear amendment [14] and it became part of the bill which was passed by the Senate on January 18, 1950.[15]

The bill was thereupon sent to a House-Senate Conference Committee where the present § 347(b) of Title 21 was formulated. In lieu of the Frear amendment which had been adopted by the Senate,[16] the conferees determined upon the language which was finally enacted and which now constitutes Section 347(b).

A comparison of the Frear amendment with the provision adopted by the Conference Committee demonstrates that the committee used the Frear provision as a model from which it drew the substitute provision which became part of the Oleomargarine Act of 1950. The major point of difference between the two pro-

7. 96 Congr.Rec. 45, 81st Cong., 2nd Sess. 1950.

8. S.Rep. No. 309, 1950 U.S.Code Congr. Svs. 1970.

9. 96 Congr.Rec. 46, 81st Cong., 2nd Sess. 1950.

10. 96 Congr.Rec. 73, 74, 81st Cong., 2nd Sess. 1950.

11. 96 Congr.Rec. 455, 81st Cong., 2nd Sess. 1950.

12. 96 Congr.Rec. 463, 81st Cong., 2nd Sess. 1950.

13. Senator Frear's amendment read as follows:
"§ 331. [The following acts and the causing thereof are hereby prohibited:]
* * * * *
"(m) The sale or offering for sale of colored oleomargarine or colored margarine, or the possession or serving of colored oleomargarine or colored margarine in violation of section 407(b), or 407(c).
* * * * * *
"[§ 407. * * * ]
"(b) On and after July 1, 1950, no person shall sell, or offer for sale, colored oleomargarine or colored margarine unless it is manufactured, prepared, molded, shaped, and packaged so that (1) the net weight of the contents of the retail package shall not exceed 1 pound, (2) each part or parts of the contents of such package is manufactured, prepared, and molded so as to be triangular in shape."

14. 96 Congr.Rec. 464, 81st Cong., 2nd Sess. 1950.

15. 96 Congr.Rec. 559, 81st Cong., 2nd Sess. 1950.

16. See note 13, supra, for the text of the Frear amendment.

visions was in the methods selected for the identification of oleomargarine so that any confusion between that product and butter would be minimized.

The wording of the Frear amendment leaves no doubt but that its application was limited to *retail* packages of oleomargarine and not to bulk cartons sold by producers to jobbers or wholesalers. Subdivision (b) (1) of the Frear amendment provided that "(1) the net weight of the contents of the *retail package* shall not exceed 1 pound," and subdivision (b) (2) required that "each part or parts of the contents of *such* package [be] manufactured, prepared, and molded so as to be triangular in shape." [Emphasis added.] "Such package" in subdivision 2 plainly refers to the "retail package" mentioned in subdivision 1 and to nothing else.

The wording adopted by the Conference Committee, however, while referring to a "package sold in a retail establishment" in its subdivision (b) (2) did not use the words *"such* package" in its subdivision (b) (3). Instead, subdivision (b) (3) requires that there appear on the label of *"the* package" the word oleomargarine and a statement of the ingredients. When it is considered that the Conference Committee modeled its provision after the Frear amendment, it would hardly seem possible that it intended so to broaden the scope of a criminal statute as to make it cover wholesale as well as retail sales through the simple expedient of changing "such" to "the". It is inconceivable that such a minor change in wording made under these circumstances should be construed to make a change of major substantive significance.[17]

The Congressional history of the Oleomargarine Act of 1950, the debates, the Committee reports, the Conference reports, and the statement of the House Managers contain not a single word which indicates that the statute was intended to apply to sales made by oleomargarine producers to jobbers or wholesalers. On the contrary all indications are that the statute aimed exclusively at retail packaging of oleomargarine.

The statement of the House Managers [18] as to the purpose of 21 U.S.C.A. § 347(b) (3) reads as follows:

"These special labeling and packaging provisions, which are in addition to other labeling and packaging provision of the Federal Food, Drug, and Cosmetic Act, are intended to provide assurance *that the consumer purchasing oleomargarine in retail establishments* will be fully informed as to the contents of the package. * * *" [Emphasis added.]

Representative Andreson, an opponent of the bill, and one of the House conferees, in explaining the provisions decided upon at the conference, stated that *"on the label of the 1-pound package in which oleomargarine is sold at retail* the label must contain a statement of every ingredient. * * *" Representative Andreson went on to say that

"* * * One reason why we insisted they put each one of these oils to be shown on the label was because of the fact a good many people are allergic to different oils and they should therefore know what the ingredients in oleomargarine are; * * *"[19]

---

17. The explanation given by Senator Aiken of the purpose of Subdivision 4 of § 347(b) illustrates the fallacy of such a construction:
"* * * Then we come to the third safeguard:
'(4) each part of the contents of the package is contained in a wrapper which bears the word 'olemargarine' or 'margarine' in type or lettering not smaller than 20-point type.' "That is for the

purpose of preventing the placing of four unlabeled quarter-pound packages of oleomargarine inside a package which is labeled, with the result that the smaller portions could be taken out and sold without having any identification on them." 96 Congr.Rec. 3025.

18. 96 Congr.Rec. 2971.

19. 96 Congr.Rec. 2976.

Senator George, a leading supporter of the bill, and a Senate member of the Conference Committee, explained the provisions in question as follows:

"I read further:

'(3) there appears on the label of the package (A) the word 'oleomargarine' or 'margarine' in type or lettering at least as large as any other type or lettering on such label, and (B) a full and accurate statement of all the ingredients contained in such oleomargarine or margarine.'

"The conference committee reached the conclusion that the real purpose of the amendment was to prevent fraud from being practiced upon the consuming public, * * * and, therefore, it was deemed by the conference committee, on thorough consideration, that if there appeared on the *label of each of the packages sold in retail establishments* which could not contain more than 1 pound net, the word 'oleomargarine' or 'margarine' in type or lettering at least as large as any other type or lettering on such label—that is to say, if the words were printed on the package as conspicuously as was any other printing appearing thereon, and that if a full and accurate statement of all the ingredients contained in such oleomargarine or margarine was also printed upon the package, that was adequate protection to the public.

"A further provision of the amendment agreed upon was that each part or parts of the contents *of the retail package* is contained in a wrapper which bears the word 'oleomargarine' or 'margarine' in type or lettering not smaller than 20-point type. * * *

"It is respectfully submitted that this amended provision of the act, as agreed upon in conference, affords as ample and thorough protection to the general public *buying in retail establishments* as would the original provision contained in the amendment offered by the Senator from Delaware. * * * *" [This refers to the Frear amendment which required triangular shaping and had been adopted by the Senate but rejected by the conference].[20]

The Congressional history of the Oleomargarine Act of 1950 fully confirms the conclusion that sales by producers of oleomargarine to jobbers or wholesalers in large packages are not encompassed within the proscriptions of 21 U.S.C.A. § 347(b).

On the trial there was no evidence that the object of the alleged conspiracy and the acts alleged to constitute the substantive offense were other than the wholesale sale of the mixture in 64 pound cubes packed in cartons to H. Wool & Sons who were wholesalers or jobbers. There was not a scintilla of evidence that defendant, or his alleged co-conspirators, sold or ever planned or attempted any direct sale to consumers, or even retail dealers, in retail packages of one pound or less.

However reprehensible or fraudulent the conduct of Rutstein and his associates may have been, the evidence adduced at the trial was wholly insufficient to sustain the charges of violation of 21 U.S.C.A. §§ 331(m), 333(b) and 347(b), or of conspiracy to violate these statutes.

Defendant's motion for a judgment of acquittal is granted as to both remaining counts.

20. 96 Congr.Rec. 3017.